(764 P.2d 455)

No. 61,368

STATE OF KANSAS, *Appellee,* v. WANDA J. ESTILL, *Appellant.*

Opinion filed November 10, 1988.

*Andrew L. Warren,* of Topeka, for appellant.

*Steven J. Obermeier,* assistant district attorney, *Dennis W. Moore,* district attorney, and *Robert T. Stephan,* attorney general, for appellee.

Before ABBOTT, C.J., DAVIS and GERNON, JJ.

ABBOTT, C.J.: This is a direct appeal by the defendant, Wanda J. Estill, from her convictions of four counts of harassment by telephone, contrary to K.S.A. 21-4113. She was sentenced to four concurrent terms of six months' confinement in the Johnson County jail for the class A misdemeanors.

The sole issue before us is whether the trial court erred in admitting evidence obtained as a result of a computer-generated "phone trap."

The appeal is before us on stipulated facts. The stipulation is as follows:

"Wanda J. Estill was evicted from her residence at the Cottonwood Apartments in Johnson County, Kansas. At the time she was evicted Miss Estill accused the assistant manager of the apartment complex, Jack Hoover, of being 'paid off' by Alan Wheat and Jim Yarmo, who was Hoover's boss. The defendant also accused Jack Hoover of stealing a check from her apartment.

"After the eviction Jack Hoover and his wife Lucy received numerous 'hang-up' calls on their telephone, (913) 631-7683. They never heard a spoken voice during these calls which were received at the Hoover residence in Johnson County, Kansas. A 'telephone trap' was placed on the Hoovers' telephone and the Hoovers would record the hang-up calls by written memoranda, and report them to the Shawnee Police Department, and Southwestern Bell Telephone Company. A like device was also placed on the telephone of the Cottonwood Apartments office phone, (913) 631-2386, which is also located in Johnson County, Kansas.

"On November 21, 1985, several hang-up calls were made to Cottonwood Apartments. On November 25, 1985, several hang-up calls were made to the Hoovers. Another 'phone trap' was placed on the Hoovers' telephone in the fall of 1986. On September 19, 1986, and September 21, 1986, the Hoovers received several hang-up calls. These calls were harassing to the Hoovers.

"The defendant's unlisted telephone number at her residence in Prairie Village, Kansas, is (913) 381-0913. At the time the harassing telephone calls were made, the defendant lived with her son Larry, aged 16, who denied making the calls and who knew neither the Hoovers' number, nor that of the apartment complex. During the time the September calls were made to the Hoovers the defendant worked nights at Research Psychiatric Center, (816) 441-8161. The Hoovers knew no one who worked or resided at the Research Psychiatric Center other than the defendant.

"Jo King testified, over the defendant's objection, that the hang-up calls to the Hoovers' residence and the apartment complex in November, 1985, were traced through the use of a 'phone trap,' to the defendant's residence. The September 1986 hang-up calls were traced to Research Psychiatric Center.

"Patti Grant, a records custodian at Research Psychiatric Center, testified that the defendant was working at Research Psychiatric Center in September 1986, at the time the hang-up calls were made to the Hoovers.

"The accused denied making the 'hang-up' calls to the Hoovers and to Cottonwood Apartments. The accused agreed she worked at Research Psychiatric Center during one of the dates in question, but denied working the other date.

"Apart from the 'telephone trap,' there is no direct evidence of the origin of the hang-up calls."

When a trap on a certain phone number is requested, a telephone company computer traces all calls made to that number and records and stores the numbers of the phones from which the calls originated. Here, the records showed that the "hang-up" calls to the Hoovers' home and apartment complex were placed from the defendant's unlisted home phone and from a phone at Research Psychiatric Center where she worked.

The computerized records resulting from the traps were introduced through the testimony of Jo King, the records custodian at Southwestern Bell. King explained what a computerized phone trap was and testified computerized records are made at the time a harassing call is reported and are kept in the ordinary course of business. On cross-examination, King could not testify as to how the computer operates.

Over defense objections to foundation, chain of custody, hearsay, and violation of the defendant's right to confront the witness against her, the trial court admitted the computerized records under K.S.A. 1987 Supp. 60-460(m), the business records exception to the hearsay rule. The basis of Estill's varied arguments is that there was no expert testimony that the computer generating the records was functioning properly and accurately.

In *United States v. Verlin*, 466 F. Supp. 155 (N.D. Tex. 1979), the defendant was charged with making harassing interstate

telephone calls. The telephone company's records custodian testified that computerized billing statements were compiled and kept by the phone company in the ordinary course of business.

The *Verlin* court held that under Fed. R. Evid. 803(6), which specifically includes data compilation as a business record, it is sufficient for the witness to identify the records as authentic and testify that such record was created and preserved in the regular course of business. The court dismissed the defendant's argument that admission of the computerized billing statement was improper because there was no proof that the computer by which such statements were produced was functioning properly and accurately. The court noted that a trial court has wide discretion in determining a document's reliability and held that doubts about the reliability of the data affected the weight to be accorded the evidence and not its admissibility. 466 F. Supp. at 158.

In *State v. Knox*, 18 Ohio App. 3d 36, 480 N.E.2d 120 (1984), a computer log of incoming calls was held to be admissible under Ohio's business records exception to the hearsay rule (identical to Fed. R. Evid. 803[6]), since installing traps is a regular business activity of the telephone company's security department.

In addition to foundation requirements that computer records be prepared in the regular course of business near the time of the event recorded and be authentic, some courts require testimony that standard computer equipment was used to compile the records when admitting computerized telephone records under the business records exception. See *Brandon v. State*, 272 Ind. 92, 396 N.E.2d 365 (1979); *State v. Hodgeson*, 305 So. 2d 421 (La. 1974); *Gandy v. State*, 438 So. 2d 279 (Miss. 1983). See generally Annot., Admissibility of Computerized Private Business Records, 7 A.L.R.4th 8, § 6, for the foundation requirements for admission of computerized telephone records under the business records exception to the hearsay rule.

In *People v. Holowko*, 109 Ill. 2d 187, 191, 486 N.E.2d 877 (1985), the court explained, "Printouts of the computer-stored data constitute statements placed into the computer by out-of-court declarants and cannot be tested by cross-examination." The Illinois court noted four potential sources of error in com-

puter-stored records: (1) inaccurate original information; (2) incorrectly encoding or translating the information from source documents into machine language; (3) creating a program which incorrectly instructs the computer; and (4) breakdown of the mechanical operation of the machine. 109 Ill. 2d at 192.

Citing *State v. Armstead*, 432 So. 2d 837 (La. 1983), the *Holowko* court agreed computer-generated data are different. "The evidence is generated instantaneously as the telephone call is placed, without the assistance, observations, or reports from or by a human declarant. The printouts of such data are merely the tangible result of the computer's internal operations." 109 Ill. 2d at 191. Both courts held the printout of results of computerized telephone tracing equipment is not hearsay evidence because it does not represent the output of statements placed into the computer by an out-of-court declarant, nor is the printout itself a statement constituting hearsay. *Holowko*, 109 Ill. 2d at 193; *Armstead*, 432 So. 2d at 840.

The court in *Armstead* noted that the underlying rationale of the hearsay rule is that out-of-court statements are made without an oath and their truth cannot be tested by cross-examination. "With a machine, however, there is no possibility of a conscious misrepresentation, and the possibility of inaccurate or misleading data only materializes if the machine is not functioning properly." 432 So. 2d at 840.

"Since the computer was programmed to record its activities when it made the telephone connections, the printout simply represents a self-generated record of its operations, much like a seismograph can produce a record of geophysical ocurrences, a flight recorder can produce a record of physical conditions onboard an aircraft, and an electron microscope can produce a micrograph, which is a photograph of things too small to be viewed by the human eye." 432 So. 2d at 840.

The *Armstead* court viewed the computer-generated trap data as demonstrative evidence of a scientific test or experiment and found the procedure performed by the telephone company computer demonstrated that the data was accurate and reliable enough to justify its admission. 432 So. 2d at 841. The *Holowko* court held computer records of a telephone trap admissible upon foundation proof of the method of recording and proper functioning of the particular device generating the data. 109 Ill. 2d at 192-93.

Kansas courts require foundation testimony of the method of

recording and the proper functioning of a mechanical device before the information obtained from the device is admissible. See *State v. Primm*, 4 Kan. App. 2d 314, 606 P.2d 112 (1980) (radar); *City of Shawnee v. Gruss*, 2 Kan. App. 2d 131, 576 P.2d 239, *rev. denied* 225 Kan. 843 (1978) (breathalyzer). In *Primm*, this court held that the officer operating the radar unit need not be an expert in the science or theory underlying the functions of the instrument. Evidence demonstrating the police officer was trained to operate the device was sufficient. 4 Kan. App. 2d at 316. Further, the court ruled that judicial notice could be taken of the general reliability of the radar itself without requiring expert testimony showing the nature and function of or the scientific principles underlying the device. 4 Kan. App. 2d 314, Syl. ¶ 1.

In *State v. Armstead*, 432 So. 2d 837, the victim dialed her own number after each harassing call as a method of identifying the unwanted calls on the computer printout from the trap. The printout accurately reflected these calls. Here, the Hoovers kept a log of the times at which hang-up calls were received. King's testimony and the computer data indicates calls from the defendant's home and work numbers at corresponding times.

In *Hutchinson v. State*, 642 S.W.2d 537 (Tex. App. 1982), the Texas Court of Appeals held it is not necessary to show the computer was functioning properly on the date of the offense and that it had been tested and working properly prior to that date. It held those issues go to the weight of the evidence and not to its admissibility.

A recent Virginia Court of Appeals decision, *Penny v. Com.*, 6 Va. App. 494, 370 S.E.2d 314 (1988), reaches the result defendant seeks. In *Penny*, a "call trap" was installed because obscene calls were received at that number. Of some significance is the fact that evidence was introduced of a computer-tracking malfunction of defendant's telephone. The "call trap" determining the origin of the calls indicated an abnormal electrical load on the line. Evidence was admitted that the abnormal load could be attributed to corroded wires. The wires, in turn, could cause calls to be inaccurately traced to Penny's number.

The *Penny* court reasoned that "call traps" should be analyzed as a scientific test because the reliability of the results depends on the accuracy of the call-trap device; thus, admissibility should

focus on reliability of the device itself. The court then required that in order to introduce the results, all that is necessary is to prove that, after the installation of the call trap, a call is placed and accurately traced.

As we view the case, the *Penny* test would not reach the reliability problem. In *Penny*, the corroded wiring was on the defendant's line. Although a call placed from a different number might be accurately traced, it might also be inaccurately traced to the defendant's number due to the corroded wire.

We are of the opinion the trial court properly admitted the evidence as a business record. The question of reliability goes to the weight of the evidence and not to its admissibility. The evidence here concerns the method used to employ the trap. A corresponding log attests to the accuracy and trustworthiness of the computer, and the fact that harassing calls were traced to two separate numbers, both tied to the defendant, adds to the information's reliability and trustworthiness.

The defendant's argument that admitting the computerized records into evidence violates her right to confront a witness is without merit. Records admissible under the business records exception to the hearsay rule do not violate an accused's right to confrontation. *State v. Bradley*, 17 Wash. App. 916, 567 P.2d 650 (1977); *State v. Smith*, 16 Wash. App. 425, 558 P.2d 265 (1976). See generally Annot., 69 A.L.R.3d 22, § 6; 21A Am. Jur. 2d, Criminal Law § 727.

Affirmed.