STATE OF NEBRASKA, APPELLEE, V.
BILLY R. AGUILAR, APPELLANT.
683 N.W.2d 349

Filed July 16, 2004. No. S-03-1120.

Gerard A. Piccolo, Hall County Public Defender, and John C. Jorgensen for appellant.

Jon Bruning, Attorney General, and Susan J. Gustafson for appellee.

HENDRY, C.J., CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

Billy R. Aguilar appeals his convictions and sentences for first degree assault, burglary, attempt to commit first degree murder, and two counts of use of a weapon to commit a felony.

He contends that the court improperly held a hearing during trial under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and that he was entitled to a mistrial when a stricken juror was inadvertently placed on the jury but later was replaced by an alternate juror. He also raises numerous evidentiary assignments of error.

We conclude that a trial court may, in its discretion, hold a *Daubert* hearing during trial. We also determine that he was not entitled to a mistrial. We further determine that the remaining assignments of error are without merit. Accordingly, we affirm.

## BACKGROUND

Billy and his cousin, Mario Aguilar had been good friends during elementary school, but over the years they drifted apart. Still, they remained friends until Billy started behaving in a bizarre manner.

In October 2002, Billy's behavior began to deteriorate. While Mario was exercising at the YMCA, Billy came in and unexpectedly said to Mario, " 'You're everywhere' " and " 'I can hear you in the air and in the vents in my house, and just all over. You're everywhere.' " Other witnesses stated that Billy told people that he heard Mario's voice in his head and that Billy was heard laughing and talking to himself.

On several occasions in December 2002, Mario saw Billy drive by his place of employment. On January 20, 2003, a man wearing a mask approached Mario as he was opening his place of employment. The man asked, " 'How you doing?' " and then jabbed a knife toward Mario's stomach, laughed, and began swinging the knife. He said, " 'Come here, come here,' " and Mario backed away. The man then left. Mario identified the man as Billy, stating that he recognized his voice, body, movements, and laugh. Mario called the police, but initially did not tell them Billy was the perpetrator because he wanted to work things out with Billy and "didn't want him to get in trouble." After he was unable to contact Billy, Mario called the police again and reported that Billy was the perpetrator. The record is silent on what action the police took after the knife incident.

After the knife incident, early in the morning of February 20, 2003, a person knocked on Mario's door in a distinctive pattern.

Mario asked who was there; the person responded " 'Primo,' " the word for cousin in Spanish. Mario stated that he recognized the voice as Billy's and that he looked out the window and saw Billy with his back turned. He called to him, but Billy did not respond and ran away.

At 9 o'clock that night, Mario and his wife heard the same distinctive knock on the door. Mario told his family to stay in a bedroom while he went to the door. A masked man pounded on the door and then shot and kicked it in; the intruder then shot Mario three times. Mario stated that he easily recognized Billy as the shooter.

Later, Billy's sweatshirt was tested for gunshot residue. The State's expert, Joseph Morris, an employee in the forensic department of R.J. Lee Group, testified that he was trained in gunshot residue analysis. He also testified about his experience and the quality control standards that were obtained from another company, Fisher Scientific. Billy objected to the testimony on *Daubert* grounds. The court admitted the testimony; Morris testified that he found residue on Billy's sweatshirt.

The jury found Billy guilty of first degree assault, burglary, attempt to commit first degree murder, and two counts of use of a weapon to commit a felony. The jury acquitted him of a stalking charge. The court sentenced him to varying terms of imprisonment on each count, some running concurrently and some consecutively. Billy appeals.

## ASSIGNMENTS OF ERROR

Billy assigns, consolidated and rephrased, that the district court erred by (1) holding a *Daubert* hearing during trial, (2) overruling his motion for a mistrial, (3) allowing Morris to testify about the standards from Fisher Scientific, (4) allowing Mario's testimony about Billy's handwriting, (5) allowing testimony about the cost of further testing, (6) allowing testimony from Billy's brother about writing on a piece of paper, (7) allowing testimony about Billy's meeting with Mario at the YMCA, (8) allowing testimony about the assault on January 20, 2003, (9) overruling a form of the question objection about Billy's not returning a wave, (10) allowing testimony from several witnesses about Billy's looking for a gun, (11) allowing testimony

from another cousin of Billy about a meeting with Billy, (12) allowing a 911 emergency dispatch service tape into evidence, (13) allowing evidence that Mario's wife saw Billy on her way to daycare, (14) allowing evidence about Billy's laughing, (15) allowing impeachment testimony, and (16) allowing testimony from certain police officers.

## STANDARD OF REVIEW

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. *State v. Hurbenca*, 266 Neb. 853, 669 N.W.2d 668 (2003).

The decision whether to grant a motion for mistrial is within the trial court's discretion and will not be disturbed on appeal in the absence of an abuse of discretion. *State v. Cook*, 266 Neb. 465, 667 N.W.2d 201 (2003).

Interpretation of a statute presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below. *State v. Lotter*, 266 Neb. 758, 669 N.W.2d 438 (2003).

## ANALYSIS

### TIMING OF *DAUBERT* HEARING

Billy argues that it is improper to defer *Daubert* determinations until trial.

Neb. Rev. Stat. § 27-104 (Reissue 1995) provides:

(1) Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the judge, subject to the provisions of subsection (2) of this section.

(2) When the relevancy of evidence depends upon the fulfillment of a condition of fact, the judge shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

(3) . . . Hearings on other preliminary matters shall be so conducted when the interests of justice require, or when an accused is a witness, if he so requests.

Section 27-104 is silent about the timing of a hearing to determine the admissibility of expert opinion testimony. Although we have not specifically addressed when a hearing may be held, we have indicated that a hearing before trial is not mandatory. When we adopted the *Daubert* standard, we noted that a court's decision about the admissibility of expert opinion evidence entails a preliminary assessment whether the reasoning or methodology underlying the testimony is valid and whether it can properly be applied to facts in issue. But we also stressed that in making this preliminary assessment, the trial judge has the discretion both to avoid unnecessary hearings and to require hearings when needed. *Schafersman v. Agland Coop.*, 262 Neb. 215, 631 N.W.2d 862 (2001).

■ Also, the U.S. Supreme Court has emphasized that trial courts are entitled to broad discretion concerning *Daubert* hearings. See, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999); *General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997). In addition, federal courts have determined that a *Daubert* hearing may be appropriate during trial. See, e.g., *Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775 (11th Cir. 2004); *U.S. v. Alatorre*, 222 F.3d 1098 (9th Cir. 2000).

In *Alatorre, supra*, the Ninth Circuit addressed whether a *Daubert* hearing must take place before trial. The court noted that the U.S. Supreme Court has not mandated the form that an inquiry into relevance and reliability must take. Although the Court stated in *Daubert* that the inquiry is a "preliminary" one, to be made "at the outset," the Ninth Circuit concluded that those terms did not mean that the inquiry must be made in a separate pretrial hearing. The court reasoned:

"The trial court must have the same kind of latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or not that expert's relevant testimony is reliable. . . . Otherwise, the trial judge would lack the discretionary authority needed both to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted,

and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises."

*Alatorre*, 222 F.3d at 1102. The court concluded that a pretrial hearing was not a requirement and was consistent with the court's broad discretion. The 11th Circuit has agreed, holding that "a trial court has broad discretion in determining how to perform its gatekeeper function, and nothing prohibits it from hearing a *Daubert* motion during trial." *Club Car, Inc.*, 362 F.3d at 780.

We also agree that the trial court has the discretion to hold a *Daubert* hearing during trial when the need for one arises. We conclude that the court did not abuse its discretion when it held the *Daubert* hearing during trial.

## JURY COMPOSITION

Before trial, the district court clerk incorrectly read the jurors' names that had been excused. As a result, the clerk failed to read a juror's name who had been stricken by the State and that juror sat through part of the trial before the mistake was discovered. Another juror who had not been stricken was mistakenly excused. The court gave Billy the option to discharge the juror, which he accepted; the juror was replaced by an alternate juror. Billy moved for a mistrial, which was denied.

Billy contends that he was entitled to a mistrial when, because of an error, an excused juror was improperly allowed to sit through part of the trial and was replaced by an alternate juror when the mistake was discovered. Billy argues that the alternate juror was improperly used and that he was prejudiced by the change.

Neb. Rev. Stat. § 29-2004 (Cum. Supp. 2002) addresses the use of alternate jurors and provides in part:

> The alternate jurors shall take the proper oath or affirmation and shall be seated near the regular jurors with equal facilities for seeing and hearing the proceedings in the cause, and shall attend at all times upon the trial of the cause in company with the regular jurors. They shall obey all orders and admonitions of the court, and if the regular jurors are ordered to be kept in the custody of an officer during the trial of the cause, the alternate jurors shall also be kept with the

other jurors and, except as hereinafter provided, shall be discharged upon the final submission of the cause to the jury. If, before the final submission of the cause a regular juror dies or is discharged, the court shall order the alternate juror, if there is but one, to take his or her place in the jury box.

According to Billy, under § 29-2004, the juror who was mistakenly allowed to sit through part of trial was not a "regular juror" and could not be replaced with an alternate. We disagree.

■ In reading a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense. *State v. Taylor*, 262 Neb. 639, 634 N.W.2d 744 (2001). Although penal statutes are strictly construed, they are given a sensible construction in the context of the object sought to be accomplished, the evils and mischiefs sought to be remedied, and the purpose sought to be served. *State v. Decker*, 261 Neb. 382, 622 N.W.2d 903 (2001).

■ Here, the use of the term "regular juror" in § 29-2004 is used to delineate between the initially seated members of the jury and any alternates that were seated. Thus, we conclude that a "regular juror" for purposes of § 29-2004 is a juror who took an oath and was seated, whether erroneously or not.

The court allowed Billy the choice of keeping the stricken juror, who was stricken by the State, or replacing the juror with an alternate; Aguilar chose replacing the juror. We conclude that the district court did not abuse its discretion in replacing the juror with an alternate.

### Morris' Familiarity With Fisher Scientific

Billy contends that Morris was not qualified to testify because he was not personally familiar with Fisher Scientific, the source of the standards used by the R.J. Lee Group. A standard is a known substance, like copper or lead, with a known amount being analyzed. Morris' company obtained the standards from Fisher Scientific. Billy does not argue that Morris' reasoning or methodology was invalid or unreliable, or that it could not properly be applied to facts in issue.

Morris testified extensively at trial about his background and qualifications concerning gunshot residue analysis. As part of

the analysis, Morris' company uses standards to confirm that their instruments are operating correctly. By using a "standard" consisting of a known substance with a known amount, Morris is able to verify the instrument's accuracy for gunshot residue.

Neb. Rev. Stat. § 27-702 (Reissue 1995) governs the admissibility of expert testimony. It provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Under § 27-702, a witness can testify concerning scientific, technical, or other specialized knowledge only if the witness is qualified as an expert. Whether a witness is qualified as an expert is a preliminary question for the trial court. *Carlson v. Okerstrom*, 267 Neb. 397, 675 N.W.2d 89 (2004). A trial court is allowed discretion in determining whether a witness is qualified to testify as an expert, and unless the court's finding is clearly erroneous, such a determination will not be disturbed on appeal. *Id.*

Under Neb. Rev. Stat. § 27-703 (Reissue 1995):

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Thus, firsthand knowledge is not always required as the only source of information for an expert's opinion. See *State v. Pruett*, 263 Neb. 99, 638 N.W.2d 809 (2002).

The Nebraska Court of Appeals has noted that an expert does not need to have additional expertise in the science or theory underlying instruments used in his or her field. That the expert is trained to operate a device is sufficient foundation for admitting evidence produced by the device. See, *State v. Ford*, 1 Neb. App. 575, 501 N.W.2d 318 (1993), citing *State v. Estill*, 13 Kan. App. 2d 111, 764 P.2d 455 (1988). Courts have also held that a certification of calibration solution used in blood alcohol testing is unnecessary to establish foundation for the admissibility of the test. See *Barna v. Commissioner of Public Safety*, 508 N.W.2d 220 (Minn. App. 1993).

Thus, it is unnecessary that Morris be personally familiar with the manner in which Fisher Scientific manufactures or supplies calibration substances or standards. It is enough that Morris is qualified to operate the devices and interpret the results.

Here, Morris testified about his personal knowledge of gunshot residue testing and his qualifications and ability to accurately perform the tests. Had Billy wished to challenge the test's accuracy based on a theory that the quality control substances were inaccurate, he could have explored that theory through cross-examination. The court did not err by allowing Morris to testify as an expert witness.

### TESTIMONY ABOUT BILLY'S HANDWRITING

Billy contends that the district court erred when it allowed Mario to testify about Billy's handwriting. During trial, Mario identified Billy's writing on a page in a small notebook with information about types of guns to show that Billy was seeking to purchase a gun. Mario testified that he was familiar with Billy's handwriting from the years they went to school together. He also stated that he did not become familiar with Billy's handwriting for the purposes of litigation.

Neb. Rev. Stat. § 27-901 (Reissue 1995) provides:

(1) The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

(2) By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

. . . .

(b) Nonexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation.

We have held that it was not error to permit a motel clerk to testify that initials on a motel register were written by her coworkers when the clerk testified that she was familiar with their handwriting from the course of the employment. Because the familiarity with the handwriting was not acquired for the purposes of litigation, the requirements of § 27-901 were met,

and the testimony was properly admitted. *State v. Schwartz*, 239 Neb. 84, 474 N.W.2d 461 (1991). We have also held that testimony from a former spouse about familiarity was admissible. *State. v. Tyma*, 264 Neb. 712, 651 N.W.2d 582 (2002).

Billy contends that *Schwartz* is distinguishable. He argues that the motel clerk in *Schwartz* had current familiarity with the handwriting at issue, while in this case, Mario stated his familiarity with Billy's handwriting was based on observations when they were in school together. But the only restriction of § 27-901 is that the familiarity was not acquired for litigation purposes. Here, Mario testified about his familiarity with Billy's handwriting and that he did not acquire the familiarity for litigation purposes. Thus, the requirements of § 27-901 were met and the court did not err in receiving the testimony.

### REMAINING ASSIGNMENTS OF ERROR

Billy raises many remaining assignments of error that are generally evidentiary in nature. We have reviewed the record and determine that the remaining assignments of error either are without merit or have not caused prejudice.

### CONCLUSION

We determine that the court did not abuse its discretion when it held a *Daubert* hearing during trial; Billy is not entitled to a mistrial. We further determine that the court did not err in finding Morris qualified as an expert. Nor did the court err by allowing Mario to identify Billy's handwriting. We further determine that Billy's remaining assignments of error are either without merit or not prejudicial.

AFFIRMED.

WRIGHT, J., participating on briefs.