No. 113,678

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

AMIE CLEVERLEY,
*Appellant*.

SYLLABUS BY THE COURT

1.

Statutory interpretation is a question of law over which appellate courts have unlimited review. In construing a statute, the court's primary goal is to give effect to the legislative intent expressed through the plain language of the statute. Only if the language is ambiguous—meaning capable of more than one reasonable interpretation—does an appellate court look behind the plain language to legislative history or resort to canons of construction.

2.

The business records exception to hearsay in K.S.A. 2015 Supp. 60-460(m) does not require the presence of a records custodian if the party seeking to admit the business records complies with K.S.A. 2015 Supp. 60-245a. That statute provides authority for a party to issue a subpoena duces tecum for the production of business records from a nonparty. In lieu of appearing to testify about the accuracy of the records, a records custodian or a person with knowledge of the business practices that generated and retained the records may submit an affidavit with the information required by the statute.

3.

K.S.A. 2015 Supp. 60-245a(c) provides that any party may require the personal attendance of a business records custodian or the production of original business records in an action in which the business is not a party by causing a subpoena duces tecum to be issued pursuant to K.S.A. 2015 Supp. 60-245.

4.

The provisions of K.S.A. 2015 Supp. 60-460(m) incorporating the requirements of K.S.A. 2015 Supp. 60-245a do not impermissibly shift the State's burden of proof to the defendant in a criminal prosecution in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

5.

Under the facts of this case, the State presented sufficient evidence to support the defendant's conviction of mistreatment of a dependent adult.

Appeal from Johnson District Court; SARA WELCH, judge. Opinion filed February 3, 2017. Affirmed.

*Carl E. Cornwell*, of Olathe, for appellant.

*Steven J. Obermeier*, senior deputy district attorney, *Jacob Gontesky*, assistant district attorney, *Stephen M. Howe*, district attorney, *James Crux*, legal intern, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., PIERRON and MALONE, JJ.

MALONE, J.:  Amie Cleverley appeals her conviction of mistreatment of a dependent adult. Cleverley contends the district court erred in interpreting K.S.A. 2015 Supp. 60-460(m) and K.S.A. 2015 Supp. 60-245a by allowing the State to introduce

certain business records by affidavit without requiring the records custodian to testify in person at trial. She also argues that the district court's interpretation of the statutes renders them unconstitutional as applied to her. Finally, Cleverley challenges the sufficiency of the State's evidence supporting her conviction. For the reasons stated herein, we affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

We will review the factual and procedural background of Cleverley's case in detail. For years, Harriet Lynn McCool lived in her Overland Park residence with her husband, who designed and installed commercial fire suppression systems. They had no children. McCool had a sister, Ella, and four nieces living in Texas. The nieces, Charlotte Cross, Cindy Hawkins, Carol Slight, and Cheryl Wulff, claimed to have been close to McCool as they grew up and described her as a favorite aunt.

In January 2011, McCool's husband died. After her husband's death, McCool, then 73 years old, exhibited a change in personality, becoming less bubbly and more quiet. She also began exhibiting some signs of memory loss. The nieces attempted to remain in close contact with McCool after her husband died, and one or another of them visited McCool frequently between January 2011 and November 2011. Those who visited were concerned by changes in McCool's housekeeping and in her ability to recall things.

In August 2011, Darrell Street, McCool's accountant, scheduled an appointment for McCool to see Dr. Thomas Wayne Fulbright, who diagnosed McCool with the onset of mild to moderate dementia. Fulbright administered the Montreal Cognitive Exam, a tool designed to test a person's functional, cognitive ability. McCool did not perform well on the exam. Fulbright prescribed Aricept, a drug used to slow the progress of dementia.

3

Out of concern for their aunt's deteriorating condition and believing that individuals close to McCool might be taking financial advantage of her, the nieces instigated involuntary guardianship proceedings. In conjunction with those proceedings, Slight and Hawkins accompanied McCool to an appointment with Fulbright on November 14, 2011. Fulbright clearly stated that McCool was not capable of living safely alone. Though McCool wanted to remain in her own home, Fulbright recommended placing her in an assisted living facility. He further recommended that McCool attend the guardianship proceedings so that the court could assess her cognitive functions.

In addition to starting the guardianship proceedings, McCool's nieces also contracted with Visiting Angels to provide assistance for McCool. McCool did not like the initial caseworker sent by Visiting Angels, so the company sent Cleverley, who had recently been hired by Visiting Angels. Cleverley began working for McCool the day after Thanksgiving, November 25, 2011. McCool liked Cleverley, and Cleverley interacted well with McCool.

After just a few weeks, the nieces approached Cleverley about residing with McCool and caring for her on a fulltime basis. In late December 2011, Cleverley and McCool signed a contract for services prepared by one of the nieces. Under the contract, Cleverley was to be paid $3,240 twice a month, but she was not to accept any gifts from McCool. Payment for Cleverley's services came from McCool's finances.

The contract between Cleverley and McCool commenced on January 1, 2012. Cleverley continued to work for McCool until April 8, 2012. During that time, McCool's nieces continued communication with Cleverley and directed some of their aunt's care, though they had no direct control over McCool's financial affairs. They relied on Cleverley to provide them with information about their aunt and communicated with their aunt primarily through Cleverley.

4

Cleverley took McCool to several medical appointments in December 2011 and January through March 2012. The medical records for those appointments indicate that Cleverley reported worsening dementia. In late January 2012, McCool was hospitalized with kidney and urinary tract infections. Cleverley switched McCool's doctor from Fulbright to Dr. Daniel Schmoll on February 17, 2012. Schmoll also noted confusion and symptoms consistent with progression of dementia. Schmoll prescribed Namenda and a low dosage of Haldol. Schmoll recommended that Cleverley make a follow-up appointment with a neurologist, but Cleverley never made the appointment. On February 28, 2012, Cleverley called Schmoll's office complaining of continued problems with McCool. Schmoll approved an increase in the dosage of Haldol. Cleverley called back on March 6, 2012, to request refills of Haldol.

On January 12, 2012, Cleverley told the police that she possessed a durable power of attorney over McCool's medical and financial decisions. Subsequently, on January 19, 2012, Cleverley chose an attorney and took McCool to execute a durable power of attorney in favor of Cleverley. The power of attorney covered decisions affecting McCool's medical conditions and finances. The scope of the power of attorney was restricted to medical decisions on February 28, 2012, when the court appointed a conservator to handle McCool's finances.

Throughout the time Cleverley was working for McCool, McCool began to become isolated from longstanding friends and neighbors. The cause of this isolation was disputed. Nevertheless, during this time, Cleverley began to pay various family members to assist with McCool's care and to shop with McCool's credit cards. Cleverley's sister was paid $200 per night to give Cleverley two nights off work a week until Cleverley's family moved in with McCool. Cleverley's mother was paid $300 a week to clean McCool's house. Both Cleverley's mother and sister would accompany Cleverley to shop with McCool's credit cards.

5

While McCool always loved to shop, her spending and shopping habits changed dramatically after Cleverley began working for her. Cleverley admitted that McCool purchased a substantial amount of merchandise for Cleverley and her family members, but she claimed that McCool insisted on buying the items for Cleverley. While she admitted withdrawing $20,000 from two different bank accounts, Cleverley insisted that she did so at McCool's direction and with the nieces' approval. Cleverley denied that she took the cash. Cleverley also maintained that she kept the nieces informed of the purchases and that they approved them. Cleverley alleged that she told the conservator about the cash withdrawals.

The detective assigned to investigate the financial aspect of the case conservatively estimated that Cleverley charged or withdrew from McCool's bank accounts over $80,000 in the 4 months she worked for McCool. The cash withdrawals and many of the purchases were not found in the residence after McCool was hospitalized. Cleverley testified that the nieces frequently entered McCool's home and took what they wanted, suggesting that the nieces were responsible for the disappearance of the cash and merchandise.

On March 10, 2012, Cleverley took her family and McCool to visit McCool's nieces in Texas for 4 days. During a drive to Hawkins' house for a visit, McCool's head lolled backwards and she appeared nearly comatose. After arriving at Hawkins' house, McCool consumed her meal as though she were famished. When Hawkins discovered Haldol in McCool's pillbox, her husband conducted some internet research, and the nieces decided to discontinue the Haldol because they believed it was not deemed appropriate for dementia patients. When the Cleverleys arrived to pick up McCool, Hawkins questioned Cleverley about the Haldol. Cleverley stated that she had discontinued the use of Haldol but had forgotten to take the pills out of McCool's pillbox.

6

On March 19, 2012, McCool attended a medical appointment with Darci Mathison, a nurse practitioner with Schmoll. Mathison was concerned by McCool's drop in weight and diagnosed an acute urinary tract infection. Based on her observations, Mathison also believed McCool to be overmedicated and recommended a social services evaluation of McCool's home environment. When Mathison attempted to communicate her concerns to Cleverley, Cleverley announced that they needed to see an attorney. Mathison thought the response an odd one since Cleverley did not seem interested in hearing about solutions to the medical issues she had raised and because McCool was incapable of providing useful information to an attorney in her condition. Cleverley did not follow up with further doctor's visits.

The events of Easter Sunday, April 8, 2012, were hotly disputed. According to the nieces, Cleverley contacted them to inform them that McCool could barely speak. When they told Cleverley to call an ambulance, Cleverley expressed reluctance because of the appearance of the thing. The nieces insisted that Cleverley call the ambulance, so she did. In contrast, Cleverley testified that she repeatedly called the nieces seeking permission to take McCool to the hospital but that they continually asked her to delay, fearing the doctor would order McCool to be placed in a nursing facility. Nevertheless, Cleverley ultimately called an ambulance from McCool's residence.

When the paramedics arrived, Cleverley did not indicate who needed assistance; the paramedics had to inquire. The paramedics examined McCool, and she opened her eyes in response to verbal stimulation. In conducting a physical examination, the paramedics noted pinpoint pupils, a low respiratory rate, and severe lethargy. They administered two doses of Narcan, a drug used to counteract drug overdose, which enabled McCool to regain enough coherence to state her name and respond to simple instructions. McCool was hospitalized with dehydration and malnutrition in addition to a urinary tract infection. After leaving the hospital, McCool was placed in Village Shalom,

a long-term care facility. McCool was well cared-for at the facility and gained some weight before she died on October 7, 2013.

On November 30, 2012, following an investigation into potential elder abuse, the State charged Cleverley with 1 count of mistreatment of a dependent adult, a severity level 5 person felony. The total loss from McCool's accounts attributed to Cleverley in the course of the investigation was $81,355.67.

Prior to trial, the State filed a notice of intent to subpoena business records from McCool's credit card companies and to admit the records via affidavit by the records custodians. Cleverley objected, and the district court conducted two hearings to separately consider the State's ability to subpoena the records and later to consider whether the affidavits provided sufficient foundation for the records' admission. The district court ultimately ruled that the records were admissible without the testimony of the records custodians.

Following an 8-day jury trial, at which credit card statements from McCool's accounts were admitted over defense objection, the jury convicted Cleverley of the sole charge of mistreatment of a dependent adult. The jury also made a separate finding that the offense involved a fiduciary relationship which existed between Cleverley and McCool. Cleverley filed a motion for new trial alleging that the district court erroneously admitted the credit card statements based upon the affidavits of the records custodians without testimony of the records custodians to establish foundation. She argued that the district court's requirement that she produce the custodians to challenge the foundation unconstitutionally shifted the burden of proof from the State to Cleverley. She also challenged the sufficiency of the evidence demonstrating that she misappropriated between $25,000 and $100,000 of McCool's money and that Cleverley exercised undue influence over McCool. The district court denied the motion for new trial.

On April 16, 2015, the district court held a sentencing and restitution hearing. The district court ordered Cleverley to pay $78,360.10 in restitution. The district court granted the State's motion for an upward durational departure sentence based upon the fiduciary relationship between McCool and Cleverley. Based upon the upward durational departure, the district court imposed a sentence of 60 months' imprisonment with 24 months' postrelease supervision. Cleverley timely filed a notice of appeal. She also sought and obtained an appeal bond in the amount of $50,000.

ADMISSION OF CREDIT CARD RECORDS

Cleverley first contends the district court improperly admitted statements from the Chase British Airways credit card and the Capital One HSBC credit card. Specifically, Cleverley argues that the district court erred by relying on the affidavits submitted by the records custodians to admit the evidence without requiring the personal attendance of the records custodians at the trial. The State argues that the district court did not err by admitting the business records without the presence of the records custodians.

The resolution of Cleverley's claim involves the interpretation of K.S.A. 2015 Supp. 60-460(m) and K.S.A. 2015 Supp. 60-245a. Statutory interpretation is a question of law over which appellate courts have unlimited review. *State v. Collins*, 303 Kan. 472, 473-74, 362 P.3d 1098 (2015). In construing a statute, the court's primary goal is to give effect to the legislative intent expressed through the plain language of the statute. Only if the language is ambiguous—meaning capable of more than one reasonable interpretation—does an appellate court look behind the plain language to legislative history or resort to canons of construction. *State v. Barlow*, 303 Kan. 804, 813, 368 P.3d 331 (2016).

K.S.A. 2015 Supp. 60-460(m) provides:

"Writings offered as memoranda or records of acts, conditions or events to prove the facts stated therein [are exceptions to hearsay], if the judge finds that (1) they were made in the regular course of a business at or about the time of the act, condition or event recorded and (2) the sources of information from which made and the method and circumstances of their preparation were such as to indicate their trustworthiness.

"If the procedure specified by subsection (b) of K.S.A. 60-245a for providing business records has been complied with and no party has required the personal attendance of a custodian of the records or the production of the original records, the affidavit or declaration of the custodian shall be prima facie evidence that the records satisfy the requirements of this subsection."

Cleverley does not dispute that the credit card statements were generated in the regular course of business at the time the shopping transactions occurred or shortly thereafter. But she essentially challenges the information's trustworthiness, contending that the records custodians for the credit card companies should have been produced by the State at trial. She acknowledges that K.S.A. 2015 Supp. 60-460(m) authorizes the use of an affidavit by records custodians to establish the information's trustworthiness, but she contends that an affidavit is permitted only so long as no party objects to the use of the affidavit in lieu of the personal attendance of the records custodian.

Cleverley's argument is rejected by the plain language of the applicable statutes. The business record exception to hearsay in K.S.A. 2015 Supp. 60-460(m) does not require the presence of a records custodian if the party seeking to admit the business records complies with K.S.A. 2015 Supp. 60-245a. That statute provides authority for a party to issue a subpoena duces tecum for the production of business records from a nonparty. In lieu of appearing to testify about the accuracy of the records, a records custodian or a person with knowledge of the business practices that generated and retained the records may submit an affidavit with the information required by K.S.A. 2015 Supp. 60-245a(b)(3), "[u]nless the personal attendance of a custodian of the business records or the production of original business records is required under

10

subsection (c)." K.S.A. 2015 Supp. 60-245a(b)(2). K.S.A. 2015 Supp. 60-245a(c) provides that "[a]ny party may require the personal attendance of a business records custodian or the production of original business records in an action in which the business is not a party by causing a subpoena duces tecum to be issued pursuant to K.S.A. 60-245, and amendments thereto."

Cleverley contends that her objection to the absence of the records custodian was sufficient to require the State to compel the personal attendance of the records custodians. K.S.A. 2015 Supp. 60-460(m) does not state that a party may use an affidavit to establish the reliability of the records unless another party *objects* to the use of the affidavit in lieu of personal attendance of the records custodian; it permits the use of an affidavit if *no party has required the personal attendance* of the custodian. The manner in which a party litigant compels a nonparty to do anything is by court order, specifically in this case, a subpoena duces tecum. See K.S.A. 2015 Supp. 60-245a(c). Thus, if Cleverley wanted to require the records custodians to appear at her trial, she was required to issue a subpoena duces tecum in order to compel their personal attendance in lieu of affidavits.

In sum, the district court properly construed K.S.A. 2015 Supp. 60-460(m) to require Cleverley to issue a subpoena duces tecum in order to compel the personal attendance of the records custodians in lieu of affidavits. Since Cleverley did not issue a subpoena to compel the presence of the records custodians, the district court properly admitted the credit card statements under K.S.A. 2015 Supp. 60-460(m).

CONSTITUTIONALITY OF THE STATUTES

Given that the district court's interpretation of K.S.A. 2015 Supp. 60-460(m) properly incorporated the requirements of K.S.A. 2015 Supp. 60-245a, Cleverley argues that the application of the statutes was unconstitutional as applied in her case. Specifically, Cleverley argues that the district court impermissibly shifted the State's

11

burden of proof to her by requiring her to subpoena the records custodians, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The State argues that there is no constitutional violation.

Cleverley argued in district court that the application of the statutes improperly shifted the burden of proof, and the district court rejected this argument. Under the Due Process Clause of the Fourteenth Amendment, a criminal defendant is protected by a presumption of innocence that the State may only rebut with proof of guilt beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *State v. Colbert*, 26 Kan. App. 2d 177, 180, 987 P.2d 1110, *rev. denied* 268 Kan. 850 (1999). This burden of proof never shifts to the criminal defendant.

However, permitting a criminal defendant to present evidence to refute or undercut the State's evidence on one or more elements of the crime does not shift the burden of proof from the State. See *State v. Bethel*, 275 Kan. 456, 474, 66 P.3d 840 (2003) (rejecting constitutional challenge to affirmative insanity defense because the defense did not relieve the State of its burden to prove guilt but offered the criminal defendant an opportunity to challenge the requisite *mens rea* to commit the crime). Permitting the State to introduce business records with an affidavit pursuant to K.S.A. 2015 Supp. 60-460(m) does not affect the State's burden of proof but the manner in which that burden may be carried. If Cleverley believed that something in the affidavit of the records custodian was false and wanted to establish evidence casting doubt on the reliability of the records, she was authorized to compel the personal attendance of the records custodian to establish the lack of veracity or reliability in the records, much the same way she would impeach the testimony of a prosecution witness. See *Taylor v. Illinois*, 484 U.S. 400, 408, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988) (noting the Sixth Amendment to the United States Constitution provides criminal defendants compulsory process, through subpoena, for obtaining witnesses in their favor). Thus, the application of the statutes in question did

not improperly shift the burden of proof to Cleverley in violation of the Due Process Clause of the Fourteenth Amendment.

Finally, in one sentence of her brief, Cleverley asserts that admitting the business records in this case denied her "constitutional right of being confronted with the witnesses who were going to testify against her . . . ." Cleverley provides no authority to support this claim, which is deemed abandoned. See *State v. Murray*, 302 Kan. 478, 486, 353 P.3d 1158 (2015) (noting that the failure to support a point with pertinent authority or explain why the point is sound despite the absence of pertinent authority is deemed a failure to brief). Moreover, Cleverley did not raise a constitutional claim in district court that the application of the statutes violated her confrontation rights and the district court made no ruling on such a claim. Constitutional grounds for reversal asserted for the first time on appeal are not properly before the appellate court for review. *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). Although there are exceptions to this rule, Supreme Court Rule 6.02(a)(5) (2015 Kan. C. R. Annot. 41) requires an appellant to explain why an issue that was not raised below should be considered for the first time on appeal. Cleverley makes no attempt to comply with Rule 6.02(a)(5), and our Supreme Court has said that this rule should be strictly enforced. *Godfrey*, 301 Kan. at 1044. Thus, Cleverley's constitutional claim that the application of the statutes violated her confrontation rights is not preserved for appellate review.

SUFFICIENCY OF THE EVIDENCE

Finally, Cleverley argues that the State presented insufficient evidence to support her conviction for mistreatment of a dependent adult. When a criminal defendant challenges the sufficiency of the evidence on appeal, an appellate court considers the evidence presented at trial and any reasonable inferences to be drawn from that evidence in a light most favorable to the prevailing party to determine whether a reasonable

13

factfinder could have concluded that the evidence supported the defendant's conviction beyond a reasonable doubt. See *State v. Laborde*, 303 Kan. 1, 6, 360 P.3d 1080 (2015).

In order to convict Cleverley of mistreatment of a dependent adult, as defined in K.S.A. 2011 Supp. 21-5417(a)(2), the State was required to prove that Cleverley knowingly took unfair advantage of McCool's physical or financial resources for another's personal or financial advantage by the use of undue influence and that McCool's loss was between $25,000 and $100,000. See K.S.A. 2011 Supp. 21-5417(b)(2)(D). Cleverley challenges the sufficiency of the evidence supporting two elements of the offense: that Cleverley exerted undue influence over McCool and that Cleverley caused at least $25,000 in loss to McCool.

*Undue influence*

The district court provided the jury with the following definition of undue influence:

> "'Undue influence' means the improper use of power or trust in a way that deprives a person of free will and substitutes another's objective. The test of undue influence is whether the party exercised her own free agency and acted voluntarily by the use of her own reason and judgment."

Cleverley does not challenge the adequacy of the district court's instruction. Instead, Cleverley contends that the State's theory of the crime involved Cleverley's systematic isolation of McCool so that she could exercise unimpeded influence over McCool's financial decisions. Cleverley argues that this theory was undermined by evidence that the nieces were primarily responsible for McCool's isolation, not Cleverley.

Cleverley correctly notes that substantial evidence at trial—much of it her own testimony—suggested that the alienation of many of McCool's neighbors and friends was

14

the product of the nieces' animosity toward these individuals that began before Cleverley met McCool. However, other evidence suggested that Cleverley also actively alienated some people close to McCool by attempting to keep McCool's nieces from visiting and by replacing former service providers with family members. While the evidence is disputed, there is direct evidence that Cleverley actively participated in McCool's isolation. It was the jury's prerogative to resolve any conflicting evidence against Cleverley. Moreover, Cleverley did not necessarily have to cause McCool's isolation in order for the jury to conclude she exercised undue influence over McCool. Cleverley might simply have taken advantage of circumstances created by others to exert such influence over McCool. When the record is considered as a whole, the jury's conclusion that Cleverley exercised undue influence over McCool is well supported.

Cleverley also claims that she did not understand the extent of McCool's dementia, but her testimony stands in stark contrast with the medical records indicating that Cleverley brought McCool to her medical appointments with complaints of increasingly worsening dementia symptoms. Despite this knowledge, Cleverley used McCool's credit cards to spend lavishly on herself and her family members. This was in addition to Cleverley's substantial salary of $3,240 twice each month. Cleverley gave herself a bonus check at Christmas in the amount of $700 and paid her extended family members significant amounts of money to perform services for McCool. The evidence at trial, taken in a light most favorable to the State, supports the jury's conclusion that Cleverley exerted undue influence over McCool.

*Loss of at least $25,000*

Cleverley also contends that the evidence of McCool's loss is based entirely on speculation. The State estimated that $81,355.67 in loss was attributable to Cleverley. The district court awarded $78,360.10 in restitution. Because the transcript of the

15

sentencing hearing has not been included in the record, the discrepancy in the State's loss estimate and the district court's restitution judgment is unclear.

During the trial, the State reviewed, in painstaking detail, its method of loss calculation and the credit transactions it included in that calculation. In calculating a loss figure, the State categorically excluded items that might be deemed necessary for the household, even if the circumstances surrounding the purchase were suspicious. In reviewing other merchandise purchases, the detectives selected only purchases inconsistent with McCool's normal shopping patterns, excluding jewelry and clothing styles typically worn by McCool. Many of the purchases included in the loss calculation involved clothing suitable for young people or electronic devices like gaming systems and computers, which everyone universally agreed McCool did not use.

To establish that McCool did not possess the items included in the loss calculation, the State presented a video recording of a walk-through of McCool's residence after McCool was hospitalized. The jury was permitted to view the entire recording, but the recording has not been included in the record on appeal. In addition, the State presented two surveillance videos depicting Cleverley and other members of her family conducting transactions with McCool's credit card when McCool was not visibly present. Cleverley did not deny that she used McCool's card to purchase things for herself and her family members, though she claimed the purchases were authorized by McCool.

Using its conservative calculation, the State estimated that $3,304.51 of the purchases made on McCool's Von Maur charge card were attributable to Cleverley or her family members. The State attributed $30,626.26 of the credit transactions on the British Airways and Macy's credit cards to Cleverley. The State attributed $7,178.90 of the credit transactions on the HSBC Capital One card to Cleverley. The amount of these credit transactions alone totaled $41,109.67. The State produced other evidence of loss that it attributed to Cleverley, but even if these other losses are excluded as too speculative, the

16

jury was presented with sufficient evidence to conclude that Cleverley misappropriated at least $25,000 of McCool's money for her own benefit or for the benefit of her family members.

Affirmed.