NOT DESIGNATED FOR PUBLICATION

No. 115,645

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

FOSTER L. EVERETTE,
*Appellant*.

MEMORANDUM OPINION

Appeal from Seward District Court; BRADLEY E. AMBROSIER, judge. Opinion filed September 21, 2018. Affirmed.

*Jennifer C. Roth*, of Kansas Appellate Defender Office, for appellant.

*Russell W. Hasenbank*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BUSER, P.J., PIERRON and LEBEN, JJ.

BUSER, J.: Foster L. Everette appeals his second-degree murder conviction. He raises four issues on appeal. First, Everette contends the district court violated his constitutional right to present a complete defense by erroneously sustaining the State's objections to the admission of cell phone call records. Second, Everette claims the State committed several instances of prosecutorial error during closing argument. Third, Everette asserts the district court committed clear error by giving a faulty K.S.A. 60-455 limiting instruction. Finally, Everette claims that the cumulative effect of these errors denied him a fair trial. Upon our review, we find no reversible error and affirm the conviction.

1

FACTUAL AND PROCEDURAL BACKGROUND

Everette and Andrea Garrison were in a romantic relationship for about two years before her death. While the couple did not live together, Everette occasionally spent the night at Garrison's home. Their relationship was notable for frequent discord and arguments.

On January 2, 2015, Officer Robert Breeden was dispatched to Garrison's residence at 11:51 a.m. in response to a report of possible domestic violence. Mariah Lopez, one of Garrison's sisters, had called the police after Lopez and her boyfriend, Mario Comacho, took Garrison to her home and found Everette inside the residence. Lopez did not like Everette and disapproved of the relationship.

An argument ensued between Lopez, Comacho, and Everette. According to Everette, Comacho lunged at him several times with a knife. Lopez testified that Everette was angry during the incident. After Lopez called the police, Everette and Garrison walked across the street to an alley to discuss the matter. When Everette saw the police arrive, he walked to his home. Before leaving, Officer Breeden noted that Garrison was calm and had no visible injuries. Lopez testified that she last saw her sister alive when she left the residence about noon. Of note, at 1:48 p.m. on January 2, 2015, Garrison called the county jail to make arrangements to serve some days in custody.

At about 3 p.m., Lopez returned to Garrison's home. When Garrison did not respond to her arrival, Lopez broke in through the backdoor. Lopez discovered Garrison's lifeless body hanging from a belt attached to a rod in the closet of an empty bedroom. Lopez called the police at 3:38 p.m. to report the incident. She informed responding officers that Everette had killed her sister.

When the officers cut the belt suspending Garrison's body, it slipped from an officer's grasp, and Garrison's head and right side of the body "hit a portion of the closet." Observing Garrison's body, the officers noticed several red marks around her neck, red marks on her upper right arm, and a bruise around her right shoulder. Officer Breeden opined that Garrison had been dead for some time before the officers arrived.

Detective Josh Olson found Garrison's cell phone in her bedroom. The detective examined the phone and noticed that Everette had texted Garrison a series of angry messages the day before she died. For example:

- "I'll make the fucking choice easy for you and you can go get it from who ever and when ever but you trying to keep playing with me will turn out tragic."
- "Either your gonna be with me . . . or your not cause these fuck ass games your on will eventually make the front page."
- "That cop wasn't bullshiting when he said he will kill you. I'm not saying I will so hear me out. I am not a I'll tempered person I am quick to fight but in our case of you always lying to me."
- "Everyone has their breaking point in a big dude so why would you want to keep pushing me until I snapped the fuck out? You know what your doing and how I will respond."
- "But the shit that you keep doing again and again will eventually make me flip my motherfucking lid and no matter how much I love you I won't realize what the fuck I done until its too late."
- "[T]he games and bullshit will only lead to some terrible shit happening and I nor you deserve that."
- "You have the right to do whatever you want right. Well look at it like this I not saying I should do it but also have the right to do whatever I want to it may not be

3

morally right but god make us free to choose out own paths. I don't want us to end up as a newspaper article."

Later, on January 2, 2015, at about 5 p.m., Everette called the police after he learned that Lopez had reported that he had killed Garrison. At the request of police, Everette went to the police station where he was interviewed by Detective Olson. The interview was recorded and later played for the jury.

During the interview, Everette initially told Detective Olson that he only was at Garrison's house once that day. Everette said that he last saw Garrison at about 12:30 p.m., after the disturbance at her home. Everette allowed Detective Olson to review the call history, texts, and other information contained on his cell phone. The detective noticed that Everette had called Garrison several times at about 1:51 p.m. Detective Olson asked Everette if he returned to Garrison's home when he could not get ahold of her. Everette repeatedly denied returning to Garrison's home after he had left about 12:30 p.m. Instead, Everette claimed that he had spent the afternoon visiting friends and relatives.

Detective Olson then asked Everette if his cell phone's GPS would show that he was at Garrison's home between 2 p.m. and 4 p.m. In fact, the GPS on Everette's cell phone did not show that Everette had been in Garrison's home during the afternoon. The detective suggested there could be an innocent reason for Everette's cell phone to be at Garrison's home during that time period, explaining that Everette could have left his cell phone after the earlier disturbance. In response, Everette said there was no reason why his cell phone's GPS would show he was at Garrison's home during that time.

After examining Everette for injuries, Detective Olson left the interrogation room to further examine and photograph the messages on Everette's cell phone. While Everette was alone in the room, he put his jacket on and said, "Oh, shit" and "Damn." When

4

Detective Olson returned to the interrogation room, Everette informed him that he forgot and that he did, in fact, leave his cell phone at Garrison's home and returned there in the afternoon to retrieve it after making several unsuccessful calls to her about 1:51 p.m. Detective Olson then confronted Everette that his latest account made no sense. According to the detective, "I asked him how he could possibly call her if his phone was there with her." Detective Olson testified that Everette "was silent. He was confused. He didn't really have an answer." Everette denied killing Garrison, and he stated that although she had previously threatened suicide, he did not think she would do it.

Doctor Hubert Peterson, the Seward County coroner, performed an autopsy on Garrison's body and opined that the cause of Garrison's death was "she lost the ability to breathe, because of the ligature around the neck, and it causes asphyxiation, which is loss of the ability to breathe." While Dr. Peterson concluded that Garrison died by strangulation from the belt, he did not opine as to how the strangulation occurred, deferring to the police investigation. The coroner placed the time of Garrison's death at about 2 p.m. on January 2, 2015.

During his examination, Dr. Peterson noted that Garrison had a bruise on the right side of her forehead and various contusions on her lower legs. Laboratory tests indicated the presence of methamphetamine and amphetamines in the body. While processing the scene, Dena Allen, an evidence technician, collected items for testing which included the portion of the belt attached to the closet rod, the closet rod, the portion of the belt around Garrison's neck, a syringe, and Garrison's cell phone. Allen measured the distance between the floor and the closet rod at 6 feet, 5 inches. Allen observed a dresser next to the closet with a drawer halfway open and two shoes under it. Of note, at trial Lopez testified that she and Garrison frequently shared clothing, including a few belts. According to Lopez, the belt used in Garrison's hanging "didn't look like [Garrison's]. It looked large. It looked like it was somebody else's."

5

Eric Moore, a forensic scientist for the Kansas Bureau of Investigation, examined a latent fingerprint on the closet rod and identified it as coming from Everette's right thumb. DNA testing was performed on two portions of the belt, swabs from the interior of the closet, and Garrison's fingernails. On the portion of the belt attached to the closet rod, Moore found DNA consistent with Everette and Garrison's DNA profile. On the portion of the belt around Garrison's neck, Moore found DNA consistent with Garrison's DNA profile and consistent with Everette's known DNA allotype (which included his male family members). Everette's DNA was also found inside the closet door. Everette's DNA was not found underneath Garrison's fingernails. Because investigators suspected that Garrison had a rug burn on her shoulder, the carpet was tested for blood evidence but none was not found.

Everette was charged with first-degree murder and a jury trial commenced on November 30, 2015.

At trial, friends and acquaintances testified about their encounters with Everette on the day Garrison died, and the various threatening statements he made about her. Shroy Spradley testified that Everette came over to his house before 2 p.m. While at Spadley's house, Everette was angry and told Spradley that "he was going to strangle [Garrison], put a belt around her neck and make it look like that she had committed suicide."

Jamel Irons, who lived with Spradley, testified that Everette came to Spradley's house at about 1:45 p.m. Irons did not hear Everette state that he was going to strangle Garrison and make it look like she committed suicide. Irons heard Everette say, however, that "he was going to smoke the bitch and everyone else there." After Garrison's death, Irons told Everette that she had been interviewed by the police. According to Irons, Everette told her that she should have told Detective Olson that he was with Garrison the day before she died instead of the day she died.

6

Doahnte Barner, Everette's neighbor who testified that he considered Everette his brother, testified that he took Everette to Garrison's home about 2 p.m. on January 2, 2015. Barner stated that when he dropped Everette off at Garrison's home he did not see whether he walked to the front door.

In addition to Everette's threatening statements made on the day of Garrison's death, two other witnesses testified to earlier threats made by Everette. Stephanie Jones, Garrison's other sister, testified about a conversation she had with Everette a few days before Garrison's death. According to Jones, Everette said he was very angry at Garrison, he hated her, and he was going to kill her.

Jesus Beltran testified that he knew Everette from the time they spent incarcerated together. According to Beltran, in December 2014, Everette explained that "he was in jail for beating on [Garrison], hitting her, and causing some damage to her, and he was tired of coming to jail for her." Everette also told Beltran that he was going to kill Garrison, move to Arkansas, and change his identity. Beltran agreed that Everette told him that he would "[e]xterminate the bitch, kill the bitch, and take the bitch out."

The State presented four witnesses to testify about prior incidents where Everette was violent towards Garrison. Stephanie Jones, Garrison's other sister, testified that in April 2014 she saw that Garrison had been choked, had a black eye, and a twisted ankle. Jones observed actual marks on her sister's throat. Garrison told her that Everette caused the injuries. Jones reported the incident to the police. Officer Daisy Garcia confirmed that Garrison went to the police station in April 2014 to report a battery.

Audie Tibbetts testified that in October 2014, he called the police upon observing a man on the sidewalk reach up as if he was going to grab a girl, whereupon she began to scream. Officer Israel Nieves responded to the call and encountered Everette and Garrison. Everette told Officer Nieves that he had been in an argument with Garrison.

7

Finally, Lopez testified that, in November 2014, she visited Garrison's home and her sister told her that Everette had punched her. Lopez observed "my sister holding her face with a rag, and there was blood all over it and there was blood on the floor and the mirror and all over her." According to Lopez, Garrison's tooth went through her lip.

Everette testified in his own defense at trial. He acknowledged that his relationship with Garrison was at times "hostile" and the couple "would argue a lot." Everette denied killing Garrison and contended that she had committed suicide. He pointed out that Garrison had just lost her job, needed money for rent, was about to serve jail time, had pending criminal charges, and had troubled relationships. Although Everette acknowledged that his text messages to Garrison sounded bad, he explained that he was being sarcastic and a smart aleck. Everette admitted he "was being overbearing on getting my point across." He denied telling Irons that he would "smoke" everybody in the house, informing Spradley that he was going to stage Garrison's death as a suicide, or telling Beltran that he was going to kill Garrison.

Everette testified that when the police arrived at Garrison's home the first time, he threw marijuana out of his pocket before leaving the area. Later, Everette explained that he got a ride back to the alley adjacent to Garrison's home. He did not return to Garrison's home, but he found the marijuana which was in the nearby alley and then ran back to his house. Everette did not recall telling Detective Olson during the interview that he went to Garrison's home to retrieve his cell phone. Everette explained that he said "shit" and "damn" when Detective Olson left the interrogation room because he suddenly realized the marijuana was still in his jacket pocket.

The jury found Everette guilty of second-degree murder. Everette's motion for a new trial was denied. The district court then sentenced him to 272 months in prison. Everette appeals.

8

Everette contends the district court violated his constitutional right to present a complete defense by refusing to admit cell phone call logs offered in evidence by the defense. The State presents a three-part response. First, it argues that Everette did not preserve this issue for appeal. Second, it contends the district court's evidentiary ruling was correct because there was insufficient foundation to admit the call logs in evidence. Finally, the State asserts that Everette's constitutional right to present a complete defense was not impaired because Everette, through cross-examination, was allowed to establish the content of the call logs.

During the police investigation, the cell phones of Everette and Garrison were seized and their call histories, messages, emails, and other contents examined. Detective Olson then executed search warrants and obtained call logs for both individuals' cell phones from their respective cell phone providers. At trial, the call logs were not marked as State's exhibits or admitted in evidence, and it does not appear that Detective Olson referred to them in the State's case-in-chief.

Based on a forensic investigation into the contents of both cell phones, Detective Olson testified that all phone activity on January 2, 2015, from Everette's cell phone to Garrison's cell phone stopped at 1:51 p.m. and resumed at about 4 p.m. Detective Olson also explained that Everette's cell phone received text messages and calls from individuals between 1:51 p.m. and 2:40 p.m. without making any response. The State's theory of prosecution was that this time period was the probable time when Everette killed Garrison and staged her death as a suicide.

During cross-examination, Everette sought to admit the service providers' call logs through the testimony of Detective Olson. Everette marked the records as Defendant's exhibits 3, 4 and 5. Detective Olson clarified that he obtained the call logs in response to

a search warrant and did not create the documents. The State objected to their admission, arguing the call logs were not "properly foundationed [*sic*] by the creator or makers of the documents." When the district court asked defense counsel how he was going to "overcome the foundation problem," defense counsel replied, "Well, I don't have the record and the person, Judge. I don't overcome it." The district court sustained the State's objection, finding that Everette failed to establish a sufficient foundation to admit the call logs in evidence.

Later, Everette sought to admit the call logs when Detective Olson testified as a rebuttal witness. The State renewed its objection to lack of foundation. Everette reprised his earlier argument that sufficient foundation was laid because the detective obtained the call logs from service providers in response to search warrants. Of note, although the district court reaffirmed its prior denial to admit the call logs, it still allowed Everette to question Detective Olson about the contents of the call logs without their admission in evidence.

When asked about the contents of the call logs, Detective Olson stated that Garrison's call log listed no incoming calls from Everette at 1:51 p.m.—the time when the detective had testified Everette last called Garrison before her death. Detective Olson explained, however, that while Everette's cell phone showed he made the calls at 1:51 p.m., Garrison's call log did not record all of those incoming calls because she had a program application that allowed her to block Everette's number. The detective was not asked any questions about whether Garrison's call logs showed that she used her cell phone to make several calls to Lopez from 1:21 p.m. until 2:40 p.m. on the afternoon of her death.

*Preservation*

On appeal, the State first argues that Everette failed to preserve this issue for appeal because he did not make a formal proffer of the call logs at trial. Everette did not file a reply brief responding to this argument.

A proffer of the substance of the evidence sought to be admitted is generally required for an appellate court to properly review a challenge to its exclusion. K.S.A. 60-405; *State v. Garza*, 290 Kan. 1021, 1029, 236 P.3d 501 (2010). "K.S.A. 60-405 serves a dual purpose: (1) It assures the trial court is advised of the evidence at issue and the nature of the parties' arguments; and (2) it assures an adequate record for appellate review." *State v. Swint*, 302 Kan. 326, 332, 352 P.3d 1014 (2015). "But no formal proffer is required if an adequate record is made in a manner that discloses the evidence sought to be introduced." 302 Kan. at 332.

At trial, Everette failed to make a formal proffer of the call logs he sought to admit in evidence. Upon our review, however, we are persuaded that the motions, arguments, and in-court discussions adequately advised the district court and our court of the call logs Everette sought to admit in evidence. As a result, we conclude that a formal proffer was not required, and Everette's evidentiary issue is preserved for appeal.

*Foundation*

Turning to the merits of this issue, Everette contends the district court excluded evidence integral to his defense when it sustained the State's foundation objections to the admission of the call logs.

"A trial court violates a criminal defendant's fundamental right to a fair trial if the court excludes relevant, admissible, and noncumulative evidence that is an integral part

11

of the theory of the defense." *State v. Banks*, 306 Kan. 854, 865, 397 P.3d 195 (2017). A defendant's right to present evidence in support of a defense, however, is subject to statutory rules and judicial interpretation of the rules of evidence and procedure. 306 Kan. at 865.

When reviewing a challenge to a district court's exclusion of evidence, we first consider whether the evidence is relevant. *State v. Bowen*, 299 Kan. 339, 348, 323 P.3d 853 (2014). Everette asserts that Garrison's call log showed that she made several calls to Lopez in the afternoon of January 2, from 1:21 p.m. until 2:40 p.m. Moreover, Everette claims that his call log showed that he did not make a series of calls to Garrison at 1:51 p.m., but that he called her at 12:53 p.m. and 3:48 p.m. The State does not dispute the relevance of this claimed evidence.

We next apply the statutory provisions governing admission and exclusion of evidence. Evidentiary rules governing the admission and exclusion of evidence are applied as a matter of law or in the exercise of the district court's discretion, depending on the rules in question. 299 Kan. at 348. A district court has considerable discretion when ruling on foundation evidence and its determination will not be reversed absent abuse of discretion. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 73, 350 P.3d 1071 (2015). A judicial action constitutes an abuse of discretion if: (1) no reasonable person would take the view adopted by the trial court; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015).

"'The proponent of a particular kind of evidence, whether it be a physical object or the testimony of a witness, is required to lay a foundation before it may be admitted into evidence.'" *Wiles*, 302 Kan. at 74 (quoting 3 Barbara, Kansas Law and Practice, Lawyers Guide to Kansas Evidence § 1.9, p. 28 [5th ed. 2013]). No evidentiary rule explicitly requires a foundation for admission. Instead, a foundation is a "'loose term for preliminary questions designed to establish that evidence is admissible.'" *Wiles*, 302 Kan.

at 74 (quoting *A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 [7th Cir. 2001]). The purpose of a sufficient foundation is to prevent the finder of fact from being exposed to inadmissible evidence. *Wiles*, 302 Kan. at 74.

As he argued at trial, and now on appeal, Everette states: "Simply put, the [call logs were] obtained by law enforcement from the phone companies and turned over to the State as a result of a search warrant. That is sufficient foundation." Everette then reasons that our court should treat the call logs either as nonhearsay or as writings under K.S.A. 60-401(m).

We will consider whether Everette laid a sufficient foundation to admit the call logs as either nonhearsay or under an exception to the hearsay rule, K.S.A. 60-460(m).

Hearsay is defined as "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated." K.S.A. 2017 Supp. 60-460. Hearsay evidence is inadmissible unless it falls under a recognized hearsay exception. *Boldridge v. State*, 289 Kan. 618, 634, 215 P.3d 585 (2009).

Whether the call logs are hearsay depends on how they were created; either as computer-stored information or computer-generated information. See *State v. Schuette*, 273 Kan. 593, 596-98, 44 P.3d 459 (2002), *disapproved of on other grounds by State v. Schoonover*, 281 Kan. 453, 133 P.3d 48 (2006). Computer-generated information is a record entirely self-generated by the internal operations of a computer system, while computer-stored information is data placed into a computer by an out-of-court declarant. 273 Kan. at 596. Unlike computer-stored information, computer-generated records do not constitute hearsay. 273 Kan. at 598.

13

In this case, Everette presented no evidence regarding how the call logs were created. Kansas courts require foundation testimony regarding "the method of recording and the proper functioning of a mechanical device before the information obtained from the device is admissible." *State v. Estill*, 13 Kan. App. 2d 111, 114-15, 764 P.2d 455 (1988). If the call logs were entirely computer-generated, Everette produced no evidence to establish that fact. Without such evidence, there was no foundation to admit the call logs as nonhearsay-computer-generated records. See *Baker v. State*, 223 Md. App. 750, 762-63, 117 A.3d 676 (2015). Moreover, Everette failed to present evidence that the equipment creating the call logs was functioning properly when the logs were created. See *Schuette*, 273 Kan. at 597-98 (noting a foundation requirement of reliability which is satisfied through witness testimony provided that the device was operating properly). As a consequence, Everette failed to lay a foundation to admit the call logs as nonhearsay evidence.

Next, we consider whether the call logs were admissible under the hearsay exception for business records. Admissibility of business records is a question determined by the district court upon a preliminary showing of their authenticity and accuracy. *Wiles*, 302 Kan. at 74. "The trial court's determination will not be disturbed unless there has been an abuse of discretion." 302 Kan. at 74.

"Computer data compilations may be admissible as business records if a proper foundation is established at trial." *State v. Murray*, No. 113,622, 2017 WL 544641, at *4 (Kan. App. 2017), *rev. denied* 306 Kan. 1327 (2017). The call logs would have been admissible under the business records exception to hearsay if the district court found: "(1) They were made in the regular course of a business at or about the time of the act, condition or event recorded; and (2) the sources of information from which made and the method and circumstances of their preparation were such as to indicate their trustworthiness." K.S.A. 2017 Supp. 60-460(m). "To bring evidence within the business records exception, a witness who can identify the report and explain the methods and

14

procedures used in its production must testify and establish that the elements of K.S.A. 2015 Supp. 60-460(m) are satisfied." *Murray*, 2017 WL 544641, at *4.

Our Supreme Court has noted that K.S.A. 60-460(m) does not require the custodian of business records to be called to lay the foundation facts for their admission into evidence. *State v. Cremer*, 234 Kan. 594, 601, 676 P.2d 59 (1984). The *Creamer* court explained:

> "The foundation facts may be proved by any relevant evidence and the person making the entries in the records need not be called to authenticate them if they can be identified by someone else who is qualified by knowledge of the facts. The policy of this section is to leave it up to the trial court to determine whether the sources of information, method, and time of preparation reflect trustworthiness." 234 Kan. at 601.

Moreover, of particular importance to this appeal, before admitting evidence of call logs to dispute the time that phone calls were allegedly made, "[*a*]*rguably, a telephone company employee should be required to testify as to how the time of a call is recorded*." (Emphasis added.) *State v. Wilson*, 11 Kan. App. 2d 504, 511, 728 P.2d 1332 (1986).

The wisdom of *Wilson*'s precedent is especially shown in this case. Everette asserts the call log for his phone shows that he called Garrison at 12:53 p.m. and not again until 3:48 p.m., but he fails to note that these times are not based on the Central Standard Time Zone. Instead, Everette's call log apparently used Coordinated Universal Time and lists the times he references as 12:53 p.m. (UTC +0) and 3:48 p.m. (UTC +0). In summary, without sufficient foundation, the authenticity and meaning of the call logs was questionable.

A review of Kansas cases shows that district courts may uphold the admission of call logs when the foundation is established by either: (1) calling an employee from the

phone company to testify about the process by which the call records are created and explain that the records are made in the ordinary course of business, See, e.g., *State v. Carr*, 54 Kan. App. 2d 780, 796-97, 406 P.3d 403 (2017), *rev. denied* 307 Kan. 989 (2018); *State v. Rivera*, 42 Kan. App. 2d 914, 923, 218 P.3d 457 (2009); or (2) providing an affidavit or declaration from a records custodian under K.S.A. 2017 Supp. 60-460(m) and K.S.A. 2017 Supp. 60-245a(b). See, e.g., *State v. Cleverley*, 53 Kan. App. 2d 491, 499, 390 P.3d 75 (2017) (in the context of credit card statements). Neither of these methods which are essential to authenticate the call logs were used in this case.

In this case, Everette failed to elicit any testimony showing that the call logs were made in the regular course of business at or near the time the events were recorded. Without this basic evidentiary foundation, the call logs were not admissible under the business records exception to hearsay, K.S.A. 60-460(m). Detective Olson had no knowledge of the methodology by which the call logs were created, their trustworthiness, or whether they were made in the ordinary course of business. Simply obtaining the records by executing search warrants does not establish a foundation for admissibility.

Finally, we note that although the district court did not admit the actual call logs in evidence, the court did permit defense counsel to question Detective Olson based on his understanding of the documents. These questions developed evidence in support of Everette's theory of defense. For example, through cross-examination, defense counsel established that Detective Olson could not correlate the communications memorialized in the cell phones of Everette and Garrison with some of the call log entries. In this way, Everette was still able to present the contents of the call logs and impeach the State's evidence without the admission of the actual call logs in evidence.

16

As Everette acknowledges on appeal:

"With no objections from the State, Mr. Everette questioned [Detective] Olson about a few things on Ms. Garrison's phone log . . . evidence that Ms. Garrison's phone log does not show all of Mr. Everette's calls, and evidence of a time period where Mr. Everette got repeated calls (it is unknown if he didn't answer or was actually responsive)."

While the district court did not allow admission of the actual call logs, the contents of the call logs were made known to the jury by defense counsel's cross-examination of Detective Olson.

In summary, Everette has failed to show the district court violated his constitutional right to present a defense. Everette's theory of defense was well presented through cross-examination of the State's witnesses (including testimony about the substance of the call logs) and his own testimony. Moreover, the district court did not err by not admitting the call logs in evidence because there was no foundation shown for their admission.

CLAIMS OF PROSECUTORIAL ERROR

Everette next contends the State committed prosecutorial error during closing argument. During trial, however, Everette did not object to the prosecutor's comments which he now claims were erroneous. We will review Everette's claims for the first time on appeal since a contemporaneous objection is not required. See *State v. Anderson*, 294 Kan. 450, 461, 276 P.3d 200 (2012).

To evaluate claims of prosecutorial error, we use a two-step process:  First, we determine whether any error occurred and, if so, we then determine whether there was prejudice. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). To determine whether prosecutorial error occurred, this court "must decide whether the prosecutorial

17

acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." 305 Kan. at 109.

"In criminal trials, the prosecution is given wide latitude in language and in manner or presentation of closing argument as long as the argument is consistent with the evidence." *State v. Pabst*, 268 Kan. 501, 505, 996 P.2d 321 (2000). When a prosecutor argues facts that are not in evidence, the prosecutor engages in prosecutorial error. *State v. Hall*, 292 Kan. 841, 848, 257 P.3d 272 (2011). However, a prosecutor may draw reasonable inferences from the evidence. *State v. McCray*, 267 Kan. 339, 351, 979 P.2d 134 (1999). A prosecutor has wide latitude to create arguments that include reasonable inferences drawn from the evidence. *State v. Stone*, 291 Kan. 13, 19, 237 P.3d 1229 (2010).

If error is found, our court moves to the second step and determines whether the error prejudiced the defendant's due process rights to a fair trial. In this regard, we evaluate evidence of prejudice under the traditional constitutional harmless error inquiry enumerated in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). *Sherman*, 305 Kan. at 109.

> "In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" 305 Kan. at 109 (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011]).

18

We will address each of the prosecutorial error claims individually.

*Testimony Regarding Bruises on Garrison's Neck*

Everette argues that the prosecutor mischaracterized Dr. Peterson's testimony during closing argument when he said:

"When [Everette] got to the victim's house in a fit of rage, he strangled her with the belt.

"Dr. Peterson testified there [were] two sets of marks around the victim. There was a lower mark on the neck and a higher set of marks on the neck. The lower mark on the neck is where the defendant strangled her at. He then took her to the closet, hung her up in the closet."

Everette asserts these comments mischaracterized Dr. Peterson's testimony because the physician never testified that one set of marks was caused by Everette strangling Garrison while the other set was the result of hanging.

During the trial, Dr. Peterson testified:

"[THE PROSECUTOR:] Now, when you say there was bruising around the throat area or neck, where about would that be, lower or upper?
"[DR. PETERSON:] Well actually, there was a couple of places. One was below the thyroid cartilage and one above the clavicle. And then the second one had ridden up over the cartilage, and basically, it's where the noose was tied and that was the final position of it. So it was a rather wide area of contusion.
"[THE PROSECUTOR:] Okay. So the first marks are down lower on the throat or neck?
"[DR. PETERSON:] Yes, and the hanging to begin with, the noose may be rather loose, but whoever puts it on there and it can be around the neck lower. And when the body—when you've lost the support of the legs, the noose would ride up in a final position. And that's where it would cause the maximum amount of damage.
"[THE PROSECUTOR:] And so in effect, it would leave marks all the way up the throat?
"[DR. PETERSON:] Yes."

19

As Everette states, Dr. Peterson did not testify that the bruises found on the lower part of Garrison's neck were caused by Everette strangling her with the belt prior to hanging her in the closet. That said, when the prosecutor's argument is read in full context, we are persuaded the prosecutor was summarizing all of the evidence in support of the State's murder theory of strangulation prior to hanging in correlation with the coroner's testimony about the extensive bruising on Garrison's lower and upper neck.

Appellate courts typically read challenged remarks by a prosecutor in their full context because "reading [such] comments in isolation can frequently be misleading as to the message that the prosecutor was conveying to the jury." *State v. Naputi*, 293 Kan. 55, 59, 260 P.3d 86 (2011). In this case, the full context of the prosecutor's remarks are helpful to the analysis:

> "Dr. Peterson testified there was two sets of marks around the victim. There was a lower mark on the neck and a higher set of marks on the neck. The lower mark on the neck is where the defendant strangled her at. He then took her to the closet, hung her up in the closet. That's why his thumbprint is on the closet rod. That's why his DNA is on both pieces of a belt. I believe the science is clear here that the defendant handled the belt. . . . That thumbprint's there because that's where he grabbed when he leveraged the belt around that closet rod. That's what the defendant did, in this case. And the reason his DNA is on both pieces of the belt is because he handled that belt when he strangled Andrea Garrison."

When viewed in full context, we find that the prosecutor referenced Dr. Peterson's testimony to point out that there were two sets of marks on the victim's neck. This was consistent with Dr. Peterson's testimony. After reiterating that Garrison's neck had two sets of marks, the prosecutor then argued the State's murder theory based on all the evidence—the lower set of bruises were caused by strangling with the belt prior to the hanging and the higher set of bruises were the result of hanging. The prosecutor did not attribute this argument to Dr. Peterson's expert testimony. Rather, the argument that

20

Everette strangled then hung Garrison was based on the evidence of Everette's thumbprint on the closet rod and his DNA on the belt. Of course, this argument was also supported by the testimony of Spradley who recounted how, shortly before Everette left for Garrison's house on the afternoon of her death, Everette stated that "he was going to strangle [Garrison], put a belt around her neck and make it look like that she had committed suicide."

We conclude the prosecutor did not mischaracterize Dr. Peterson's testimony or argue facts not in evidence when explaining the State's theory of how Garrison was murdered. Given the totality of the trial evidence and drawing reasonable inferences from that evidence, the prosecutor did not engage in improper argument with regard to the State's theory as to the origin of the multiple bruises on Garrison's throat and neck.

*Testimony Regarding Bruise on Garrison's Head and a Struggle*

Everette asserts the State committed prosecutorial error when it claimed a bruise on Garrison's forehead occurred before her death because "[d]ead people don't bruise," and the prosecutor asserted there was a struggle between Everette and Garrison prior to her death. The State counters that the prosecutor's remark about the bruise on Garrison's forehead "is not out of line as it is common knowledge that a bruise can only form if blood is being pumped by the heart."

During Dr. Peterson's testimony, he confirmed that at autopsy there was a bruise on the right side of Garrison's forehead. The physician did not state an opinion whether the bruise occurred before or after Garrison's death. At about noon on the day Garrison died, however, Officer Breeden testified that Garrison had no visible injuries. Officer Breeden also testified that when Garrison was cut down from the closet rod, her body fell and her head hit inside the closet.

21

In closing argument, Everette claimed the bruises and scrapes could have occurred when Garrison's body fell and hit inside the closet. In its rebuttal argument, the State asserted: "There was testimony there was a bruise on her head. Dead people don't bruise. That bruise was there ahead of time. And that bruise came from her struggle with Foster Everette, the defendant, in this case." Everette claims these statements were prosecutorial error.

We are persuaded the State did not engage in prosecutorial error by arguing there was a struggle between Everette and Garrison. The evidence revealed that at autopsy Garrison had scrapes on her shoulder and bruises on her head and legs, although she had no visible injuries a few hours prior to her death. The prosecutor's assertion that Garrison sustained these injuries in a struggle with Everette was a reasonable inference based on the evidence and did not amount to prosecutorial error.

On the other hand, when the prosecutor stated that Garrison's bruise occurred before her body was cut down because "[d]ead people don't bruise," he committed prosecutorial error. "[W]hen a prosecutor refers to facts not in evidence, such statements tend to make the prosecutor his or her own witness who offers unsworn testimony not subject to cross-examination." *State v. Morris*, 40 Kan. App. 2d 769, 791-92, 196 P.3d 422 (2008).

In *State v. Simmons*, 292 Kan. 406, 412-14, 254 P.3d 94 (2011), our Supreme Court held that a prosecutor committed error when he asked the jury to view evidence of the victim identifying with her captor as the consequence of Stockholm syndrome. The *Simmons* court held the prosecutor improperly referred to facts not in evidence. Moreover, this error was exacerbated because the prosecutor's comment implied that he was an authority on Stockholm syndrome and could diagnose the victim as suffering from it. 292 Kan. at 413-14.

22

Here, the State committed prosecutorial error because its theory that the bruise was caused prior to death was based on the prosecutor's unsupported claim that bruising can occur only prior to death. We disagree with the State that this is a matter of common knowledge. Like *Simmons*, the prosecutor's comment was not based on any trial testimony or evidence. As a result, we find this comment was prosecutorial error. We will defer our harmless error analysis until the remaining claimed errors are addressed.

*Dragging Garrison into the Bedroom While Enraged*

Everette next argues that the prosecutor committed prosecutorial error when he stated that Garrison ended up in the spare bedroom "because [Everette] drug her into that room, when he was in a fit of rage." Everette claims there was no evidence to support this argument by the prosecutor.

At trial, Detective Olson testified that Garrison had a "burn mark on the top of her shoulder, and we thought she was probably drug into that room." Moore also testified that Garrison had a "rug burn" on her shoulder. Additionally, Garrison's phone was located in her bedroom, away from where her body was found. Lastly, there was considerable evidence from Everette's text messages to Garrison on the day before her death that he was angry at her. Both Spradley and Irons testified to Everette's anger and his intent to injure or kill Garrison that he expressed in the early afternoon of her death. As a result, the prosecutor's remark about Garrison being drug on the carpet and Everette being enraged at the time of the killing were fair inferences from the trial evidence. We conclude the prosecutor's argument in this regard was not error.

*Relevance of Phone Calls*

For his final claim of prosecutorial error, Everette complains about the prosecutor's comments regarding the importance of the cell phone evidence. In closing, Everette argued:

"The phone records, they make such a big deal about the phone. The phone was here. They have possession of the phone records. Let us see who called and who wasn't around that time. They didn't present that to you. That is evidence. They took the phone, they make such a big deal about it, they presented it to you, those phones are sitting in the box so you can look at it. But those phones are no good to us, unless they tell us something, except whose phone it was."

In rebuttal, the State responded:

"The phone calls are *only* important because it shows at 1:51 on the defendant's phone, that he's calling Andrea Garrison. And then all calls stop from 1:51 until 2:40 in the afternoon. And the reason that is and the reason that nobody could get ahold of him, either, is because *that's the time that he killed Andrea Garrison. That's the time that he spent in that house and killed her*." (Emphases added.)

Everette claims the State committed prosecutorial error by arguing: (1) that Everette killed Garrison during the time period between 1:51 p.m. and 2:40 p.m., and (2) that inference was "the 'only important' thing the *unproduced* phone records would have showed." We disagree.

First, the State did not commit prosecutorial error by arguing that Everette killed Garrison between 1:51 p.m. and 2:40 p.m. Detective Olson testified that Everette had called Garrison at 1:51 p.m. and there was a period between 1:51 p.m. and 2:40 p.m. when Everette did not respond to his phone. Detective Olson also testified that Everette said that he went back to Garrison's house after making the 1:51 p.m. calls. Everette's

neighbor testified that he took Everette to Garrison's home at about 2 p.m. on the day she died. Dr. Peterson opined that Garrison died around 2 p.m. At about 3 p.m., Lopez returned to Garrison's home to discover her body hanging in the closet. The prosecutor's argument that Everette killed Garrison about the time he was not responding to his cell phone was a reasonable inference based on the totality of the evidence. We find no error.

Turning to Everette's second point, he argues that the prosecutor improperly commented on the singular importance of the call logs. But Everette argues the call logs were also important because they showed that Garrison's cell phone was used to contact her sister during the time frame the State claimed Everette killed Garrison.

Contrary to Everette's argument, when discussing the importance of the cell phone evidence, the prosecutor was not referring to the inadmissible call logs. Instead, the prosecutor was explaining the activity as shown on Everette's cell phone as observed by Detective Olson when he personally examined the contents of the cell phone. Since Garrison's call logs were never admitted in evidence, there was no error in the prosecutor emphasizing the importance of the cell phone evidence found on Everette's phone. The prosecutor's statements were a fair comment on the evidence admitted at trial and did not constitute prosecutorial error.

*Harmless Error*

Having found prosecutorial error in the prosecutor's comment that dead people do not bruise, we next determine whether this error is harmless. In this regard, we must consider "any and all alleged indicators of prejudice, as argued by the parties, and then determine whether the State has met its burden—*i.e.,* shown that there is no reasonable possibility that the error contributed to the verdict." *Sherman*, 305 Kan. at 111. While the strength of the evidence against the defendant may have a secondary impact on the

25

harmless error analysis, the focus of the inquiry is on the impact of the error on the verdict. 305 Kan. at 111.

After careful consideration, we conclude there is no reasonable possibility the prosecutor's error contributed to the verdict. First, the jury instructions provided that statements made by counsel are not evidence. The district court also instructed the jury to disregard any statements by counsel unsupported by the evidence.

Second, the bruise on Garrison's head was not an important evidentiary issue advanced by the parties. There were two reasonable inferences from this evidence: From the State's perspective the bruise was sustained during a struggle with Everette prior to Garrison's death. From the defense's perspective the bruise was accidentally caused when Garrison's body was removed from its hanging position. Still, these conflicting inferences were of incidental importance in a trial where other significant incriminating and exculpatory evidence was emphasized by the parties.

Garrison's bruise on the head was a minor facet of the State's evidence that Everette murdered Garrison. More importantly, the State also produced: (1) forensic DNA and fingerprint evidence; (2) evidence placing Everette at Garrison's house about the time of her death; (3) Everette's threatening text messages sent the day prior to her death; (4) multiple witnesses recalling Everette's statements of his intent to harm or kill Garrison on the day of her death or earlier; (5) contradictory statements made by Everette during the interview with Detective Olson; and (6) prior incidents wherein Everette committed acts of violence against Garrison.

Third, the prosecutor's four word comment was an isolated statement made during lengthy closing arguments. In response, defense counsel did not object. This omission suggests that any significant prejudice was not apparent to defense counsel. See *State v. Breedlove*, 295 Kan. 481, 496, 286 P.3d 1123 (2012) (Although the failure to object to a

26

prosecutor's remarks in opening argument does not preclude appellate review, "the presence or absence of an objection may figure into our analysis of the alleged misconduct." *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 [2009]).

In summary, when considering the effect of the error on the verdict, we conclude beyond a reasonable doubt that the error did not affect the outcome of the trial given the entire record. Accordingly, the prosecutorial error is harmless and does not require reversal of Everette's convictions.

K.S.A. 60-455 LIMITING INSTRUCTION

Everette contends the district court erred when giving a limiting instruction to the jury regarding the State's K.S.A. 60-455 evidence.

The district court admitted evidence that Everette had previously harmed Garrison on three occasions. The district court determined this evidence was admissible to show Everette's motive in committing Garrison's murder. During a pretrial hearing, the State explained that some of the prior instances when Everette harmed Garrison resulted in criminal convictions, while others did not. The record is unclear, however, regarding whether any of the incidents mentioned at trial resulted in a conviction.

Because the district court admitted evidence of prior instances of violence between Everette and Garrison under K.S.A. 60-455, the district court provided the jury with the following instruction: "Evidence has been admitted tending to prove that the defendant committed crimes other than the present crime charged. This evidence may be considered solely for the purpose of proving the defendant's motive."

For the first time on appeal, Everette argues this instruction improperly bolstered the State's evidence and violated his right to a fair trial by telling the jury that evidence

27

had been admitted "tending to prove" that he committed other crimes. Everette claims the district court should have replaced the phrase "tending to prove" with the word "alleging."

> "When analyzing jury instruction issues, an appellate court follows a three-step process by: (1) Determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits to determine whether error occurred; and (3) assessing whether the error requires reversal. [Citation omitted.]" *State v. Louis*, 305 Kan. 453, 457, 384 P.3d 1 (2016).

Whether a party preserved the jury instruction issue affects the reversibility inquiry at the third step. 305 Kan. at 457; see also K.S.A. 2017 Supp. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires to consider its verdict . . . unless the instruction or the failure to give an instruction is clearly erroneous.").

Everette did not object to the K.S.A. 60-455 limiting instruction at trial. As a consequence, this court evaluates Everette's claim under the clearly erroneous standard. K.S.A. 2017 Supp. 22-3414(3). An instruction is clearly erroneous only if the defendant firmly convinces the appellate court that the jury would have returned a different verdict had the instruction not been given. *State v. Solis*, 305 Kan. 55, 65, 378 P.3d 532 (2016).

Everette cites *State v. Willis*, 51 Kan. App. 2d 971, 358 P.3d 107 (2015), *rev. denied* 304 Kan. 1022 (2016), in support of his argument that the district court erred in giving the limiting instruction. In *Willis*, the district court admitted evidence that the defendant had sexually abused the victim before the charged sex crimes to show a continuing course of conduct.

28

Based on the language of the Pattern Instructions for Kansas (PIK) at the time of trial, the district court in *Willis* instructed the jury that evidence had been admitted "tending to prove" that the defendant committed crimes other than those charged. The district court denied the defendant's request to substitute the term "'alleging'" in place of the phrase "'tending to prove'." 51 Kan. App. 2d at 990. On appeal, this court noted:

> "When K.S.A. 60-455 evidence consists of a prior conviction, the 'tending to prove' language is appropriate. But when the defendant is disputing that the uncharged conduct ever occurred, and the K.S.A. 60-455 evidence does not consist of a prior conviction, the better practice would be to change the language of the limiting instruction from 'tending to prove' to 'alleging.'" 51 Kan. App. 2d at 993.

Even so, the *Willis* court held that the instruction was not erroneous because the jury instructions as a whole properly stated the law and did not mislead the jury. 51 Kan. App. 2d at 993.

Since *Willis*, the PIK instruction on the limited admissibility of K.S.A. 60-455 evidence was amended and states in relevant part:  "Evidence has been admitted (tending to prove) (alleging) that the defendant committed (crimes) (a crime) other than the present crime charged." PIK Crim. 4th 51.030 (2017 Supp.). The Notes on Use for the instruction provide that "[w]hen there is no prior conviction and defendant disputes that the uncharged conduct ever occurred, the better practice is to use the term 'alleging' rather than 'tending to prove.'" PIK Crim. 4th 51.030, Notes on Use (2017 Supp.).

Based on *Willis* and PIK Crim. 4th 51.030, Everette argues that by using the "tending to prove" language, the limiting instruction "did not leave it to the jury to determine the weight and credit to give to the State's five K.S.A. 60-455-related witnesses." Our court rejected a similar argument in *State v. Spalding*, No. 114,561, 2017 WL 1433513, at *4-6 (Kan. App. 2017), *rev. denied* 307 Kan. 993 (2017). We find the reasoning in *Spalding* persuasive and helpful to resolving this issue.

The problem with Everette's argument is that the *Willis* court ultimately held that the district court did not err by giving the limiting instruction with the tending to prove language. See 51 Kan. App. 2d at 993. Instead, our court explained that "an appellate court examines jury instructions as a whole, without focusing on any single instruction, in order to determine whether they properly and fairly state the applicable law and could not have misled the jury." 51 Kan. App. 2d at 993. Noting that the district court also had instructed the jury that it was up to it to determine the "'weight and credit to be given the testimony of each witness,'" this court found that the jury instructions as a whole properly stated the law and did not mislead the jury. 51 Kan. App. 2d at 993.

In the case on appeal, the district court also instructed the jury: "It is for you to determine the weight and credit to be given to the testimony of each witness." As in *Willis*, this instruction undermines Everette's argument that the limiting instruction given by the district court unfairly bolstered the State's K.S.A. 60-455 witnesses or otherwise removed the jury's ability to determine the weight and credibility of the State's witnesses.

The instructions in Everette's case, considered as a whole, properly stated the applicable law and would not have misled the jury. Accordingly, the K.S.A. 60-455 limiting instruction was not erroneous. Since there was no error, there cannot be clear error. See *State v. Betancourt*, 299 Kan. 131, 135-36, 322 P.3d 353 (2014).

CUMULATIVE ERROR

Finally, Everette argues that he was denied a fair trial because of cumulative error. For cumulative error, the test is whether the totality of the circumstances establish that the defendant was substantially prejudiced by all the trial errors and was denied a fair trial. In assessing the cumulative effect of trial errors, the appellate court examines the errors in the context of the entire record, considering how the district court dealt with the

30

errors as they arose; the nature and number of errors and their relationship, if any; and the overall strength of the evidence. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014).

The solitary error found on appeal was one instance of prosecutorial error in the State's closing argument. A single error cannot constitute cumulative error. *State v. Williams*, 299 Kan. 509, 566, 324 P.3d 1078 (2014).

Affirmed.